FILED by DB D.C.

Dec 29, 2015

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. – MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-21009-CR-MORENO/O'SULLIVAN

18 U.S.C. § 371

UNITED STATES OF AMERICA

vs.

JUANA ACOSTA,
ARMANDO ACOSTA, and
RICARDO BOFFILL,

        Defendants.
_____/

## INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At various times relevant to this Indictment:

1. The Food and Drug Administration ("FDA") was the federal government agency responsible for enforcing the provisions of Title 21, United States Code, Section 301 *et seq.*, which was known as the Federal Food, Drug, and Cosmetic Act ("FDCA").

2. The FDA was responsible for, among other things, the regulatory supervision and oversight of the pharmaceutical industry and related business sectors involved in the manufacture, labeling, packaging, sale, distribution or dispensing of prescription drugs.

3. The term "drug" was defined by the FDCA to include articles which were intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans and any article intended to affect the structure or any function of the human body. *See* 21 U.S.C. § 321(g)(1)(B)&(C).

4. Under the FDCA, certain drugs were approved for marketing by the FDA with the limitation that the drug product be used under the supervision of a practitioner licensed by law to administer such drugs. *See* 21 U.S.C. § 353(b)(1)(B). Other drugs, because of their toxicity and other potential harmful effects, were not considered safe for use, except under the supervision of a practitioner licensed by law to administer such drugs. *See* 21 U.S.C. § 353(b)(1)(A). Drugs in either category were commonly referred to, and hereinafter referred to, as "prescription drugs."

5. As further mandated by the FDCA, prescription drugs could legally be dispensed or refilled only at the direction of a practitioner licensed by law to administer such drugs in accordance with a written prescription or oral prescription reduced promptly to writing and filled by a pharmacist. *See* 21 U.S.C. § 353(b)(1).

**Wholesale Distribution and Retail Sale of Prescription Drugs**

6. Prescription drug manufacturers generally supplied their prescription drug products to pharmacies, hospitals and other prescription drug dispensing facilities at the retail level (hereinafter collectively referred to as "dispensers") through a chain of wholesale distributors in connection with a process regulated by the FDA which was commonly referred to as "wholesale distribution."

7. Through the wholesale distribution process, prescription drugs were frequently bought and sold between wholesale distributors before their eventual purchase by a dispenser legally authorized to dispense the prescription drugs for retail sale to patients for whom the prescription drugs had been prescribed.

8. The costs of the patients' acquisition of such prescription drugs were routinely subsidized through payments made by health care insurance providers and/or government health

care programs.

9. An approximation of the price which retail dispensers would pay wholesale distributors for a particular prescription drug was often determined by reference to databases which set forth the prescription drug's "wholesale acquisition cost" ("WAC") and its "average wholesale price" ("AWP").

**Prescription Drug Diversion**

10. The term "prescription drug diversion" described certain wholesale distributions of prescription drugs which had earlier been obtained and removed ("diverted") from the chain of lawful wholesale distributors through unlawful means, including theft, fraud, or purchases from individual patients for whom prescription drugs had been prescribed and dispensed but intentionally not consumed. Through this same process, diverted prescription drugs were unlawfully distributed and resold by individuals acting as unlicensed wholesale distributors to other individuals also acting as unlicensed wholesale distributors, or to pharmacies and other dispensers unlawfully engaged in such activity, all for the purpose of illegal sales. This illegal form of wholesale distribution resulted in the unlawful reintroduction of such diverted prescription drugs back into the wholesale distribution chain.

**Wholesale Prescription Drug Distribution Licensing Requirements**

11. To prevent prescription drug diversion, as well as the distribution of counterfeit, stolen, or substandard drugs, Congress enacted the Prescription Drug Marketing Act ("PDMA") which amended the FDCA and remained in effect until January 1, 2015.

12. Before January 1, 2015, under the FDCA and PDMA, no person could engage in the wholesale distribution in interstate commerce of prescription drugs in a State unless such

3

person was licensed by the State in accordance with guidelines established under 21 U.S.C. § 353(e)(2)(B). *See* 21 U.S.C. § 353(e)(2)(A).

13. In order to further protect the integrity of the nation's prescription drug distribution system, Congress passed relevant portions of the Drug Supply Chain Security Act ("DSCSA") which made a variety of additional amendments to the FDCA effective January 1, 2015. Under the DSCA, the above prohibition concerning wholesale prescription drug distribution was modified and the applicable statute was renumbered as 21 U.S.C. § 353(e)(1)(A). Under these DSCA amendments, no person could engage in the unlicensed wholesale distribution of a prescription drug in any State from which the prescription drug was distributed if that State had an established wholesale drug distribution licensure requirement. *See* 21 U.S.C. § 353(e)(1)(A).

14. Throughout the relevant period, both before and after January 1, 2015, the State of Florida had an established licensure requirement in effect which mandated that an individual engaged in the wholesale distribution of prescription drugs in the State of Florida was required to be licensed by the State of Florida.

15. "Wholesale distribution" was defined in the FDCA to include the distribution of prescription drugs to other than the consumer or patient but not including intra-company sales and certain other types of exempt prescription drug transactions. *See* 21 U.S.C. § 353(e)(3)(B) (effective prior to January 1, 2015) and 21 U.S.C. § 353(e)(4) (effective January 1, 2015).

16. Under Title 21, United States Code, Section 331(t), it was a prohibited act to engage in the distribution of prescription drugs in violation of either 21 U.S.C. § 353(e)(2)(A) or, as amended effective January 1, 2015, in violation of 21 U.S.C. § 353(e)(1)(A).

4

## The Prescription Drugs

17.     The drugs listed below were prescription drugs within the meaning of 21 U.S.C. § 353(b)(1) that could be dispensed lawfully only upon prescription of a practitioner licensed by law to administer such drugs. The respective manufacturers of these prescription drugs and their approved uses were as follows:

| PRESCRIPTION DRUG | MANUFACTURER | APPROVED USE(S) |
|---|---|---|
| Abilify | Otsuka America Pharmaceutical, Inc. and Bristol-Meyers Squibb Company | Anti-Depressant |
| Atripla | Gilead Sciences, Inc. and Bristol-Myers Squibb Company | HIV Medication |
| Isentress | Merck Sharp and Dohme, Inc. | HIV Medication |
| Norvir | AbbVie Deutschland GmBH & Co. KG | HIV Medication |
| Seroquel | Astra Zeneca Pharmaceuticals, LP | Bi-Polar Disorder, Schizophrenia |
| Trizivir | ViiV Healthcare and GlaxoSmithKline, PLC | HIV Medication |

18.     The pharmaceutical manufacturers set forth in the above paragraph were the only FDA-approved manufacturers of the prescription drugs listed in that paragraph. Each such prescription drug was manufactured at facilities outside the State of Florida and thereafter shipped to Florida and other states in interstate commerce for distribution to consumers in Florida and other states.

5

### The Defendants

19.     Defendant **JUANA ACOSTA**, a resident of Miami-Dade County, Florida, was not licensed by the State of Florida to engage in the wholesale distribution of prescription drugs in Florida and was not associated with any entity which possessed such license.

20.     Defendant **ARMANDO ACOSTA,** a resident of Miami-Dade County, Florida, was not licensed by the State of Florida to engage in the wholesale distribution of prescription drugs in Florida and was not associated with any entity which possessed such a license.

21.     Defendant **RICARDO BOFILL,** a resident of Miami-Dade County, Florida, was not licensed by the State of Florida to engage in the wholesale distribution of prescription drugs in Florida and was not associated with any entity which possessed such license.

22.     CS 1 was an individual who cooperated with criminal law enforcement agents.

### Conspiracy to Defraud the United States and Engage in the Unlicensed Wholesale Distribution of Prescription Drugs
### (18 U.S.C. §371)

1.     The General Allegations section of this Information is re-alleged and incorporated herein by reference as though fully set forth.

2.     From in or around September 2013, and continuing through on or about October 1, 2015, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**JUANA ACOSTA,**
**ARMANDO ACOSTA,** and
**RICARDO BOFILL,**

did willfully, that is with the intent to accomplish the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other, and other persons, known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

    a.    to defraud the United States by impairing, impeding, obstructing, and defeating through deceit, craft and trickery, the lawful governmental functions of the FDA in its administration and oversight of wholesale prescription drug distribution; and

    b.    to violate Title 21, United States Code, Sections 331(t), 333(b)(1)(D), and 353(e)(2)(A), by knowingly engaging in the wholesale distribution in interstate commerce of prescription drugs subject to 21 U.S.C. § 353(b)(1) in a State, to wit, the State of Florida, without being licensed to engage in such activity by the State of Florida which required such licensure; and

    c.    to violate Title 21, United States Code, Sections 331(t), 333(b)(1)(D), and 353(e)(1)(A)(i)(I), by knowingly engaging in the wholesale distribution in interstate commerce of prescription drugs subject to 21 U.S.C. § 353(b)(1) in a State, to wit, the State of Florida, without being licensed to engage in such activity by the State of Florida, which required such licensure.

## THE PURPOSE OF THE CONSPIRACY

3.    It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves and others by engaging in the unlawful wholesale distribution of prescription drugs.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following

4. **JUANA ACOSTA, ARMANDO ACOSTA,** and **RICARDO BOFFILL,** without possessing a license from the State of Florida authorizing them to engage in wholesale prescription drug distribution or being associated with an entity which possessed such a license, engaged in the wholesale distribution of prescription drugs in Florida, a state which required licensure with respect to those who engaged in such activity.

5. **JUANA ACOSTA** and **ARMANDO ACOSTA** illegally obtained prescription drugs which previously had been prescribed and dispensed to individual patients who sold them to **JUANA ACOSTA** and **ARMANDO ACOSTA** or sold them to other unknown co-conspirators who, in turn, sold or delivered them to **JUANA ACOSTA** and **ARMANDO ACOSTA**.

6. **JUANA ACOSTA, ARMANDO ACOSTA,** and **RICARDO BOFFILL** facilitated their purchases of diverted prescription drugs by establishing a procedure in which these same patients and other unknown co-conspirators dropped off prescription drugs in their possession at a restaurant which conducted business under the name "Cafeteria Santa Barbara." Once patients and other unknown co-conspirators delivered prescription drugs to Cafeteria Santa Barbara, an employee of the Cafeteria Santa Barbara, acting in complicity with **JUANA ACOSTA, ARMANDO ACOSTA** and **RICARDO BOFFILL,** made cash payments to such patients and other unknown co-conspirators for the prescription drugs which had been delivered.

7. **ARMANDO ACOSTA** additionally obtained diverted prescription drugs outside the confines of Cafeteria Santa Barbara from patients who sold them to him or sold them to other unknown co-conspirators who, in turn, sold or delivered them to him.

8. **JUANA ACOSTA, ARMANDO ACOSTA,** and **RICARDO BOFFILL**, with the assistance of another individual who acted in complicity with them, removed any patient prescription labels affixed to the bottles containing the diverted prescription drugs in order to conceal the fact that they had been illegally obtained from patients.

9. Once **JUANA ACOSTA, ARMANDO ACOSTA,** and **RICARDO BOFFILL** obtained diverted prescription drugs, they sold and delivered various quantities and types of these diverted prescription drugs to CS 1 and unknown co-conspirators on multiple occasions.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its purpose and objects, at least one of the co-conspirators committed and caused to be committed, in the Southern District of Florida and elsewhere, at least one of the following overt acts, among others.

1. On or about September 12, 2013, **ARMANDO ACOSTA** and **RICARDO BOFFILL** met with CS 1 and agreed to provide CS 1 with diverted prescription drugs for a fee and also provided a list of over 100 prescription drugs which set forth the WAC for each such drug.

2. On or about October 4, 2013, **JUANA ACOSTA** and **RICARDO BOFFILL** met with CS 1 and agreed to provide CS 1 with diverted prescription drugs for a fee.

3. On or about October 25, 2013, **JUANA ACOSTA** and **RICARDO BOFFILL** met with CS 1 and, after being supplied with a list of four prescription drugs which CS 1 wished

9

to purchase, **JUANA ACOSTA** advised that the price for the diverted prescription drugs would be 28% of each such prescription drug's WAC.

4. On or about October 29, 2013, **JUANA ACOSTA** distributed diverted prescription drugs to CS 1 in exchange for cash.

5. On or about November 20, 2013, **JUANA ACOSTA** distributed diverted prescription drugs to CS 1 in exchange for cash.

6. On or about January 23, 2014, **ARMANDO ACOSTA** distributed diverted prescription drugs to CS 1 in exchange for cash.

7. On or about February 7, 2014, **ARMANDO ACOSTA** distributed diverted prescription drugs to CS 1 in exchange for cash and concurrently supplied CS 1 with a list of over 300 prescription drugs with their respective National Drug Codes, WAC, and an itemized breakdown of the percentage of WAC which CS 1 would be charged for each such prescription drug.

8. On or about February 27, 2014, **ARMANDO ACOSTA** distributed diverted prescription drugs to CS 1 in exchange for cash.

9. On or about April 22, 2014, **ARMANDO ACOSTA** distributed diverted prescription drugs to CS 1 in exchange for cash.

10. On or about April 22, 2014, **ARMANDO ACOSTA** distributed diverted prescription drugs on a second occasion that same day to CS 1 in exchange for cash.

11. On or about May 29, 2014, **ARMANDO ACOSTA** distributed diverted prescription drugs to CS 1 in exchange for cash.

12. On or about July 25, 2014, **ARMANDO ACOSTA** distributed diverted prescription drugs to CS 1 in exchange for cash.

13. On or about July 29, 2014, **RICARDO BOFFILL** took delivery of a cash payment from CS 1 in connection with diverted prescription drugs previously distributed to CS 1 by **ARMANDO ACOSTA** on or about July 25, 2014.

14. On or about September 24, 2014, **ARMANDO ACOSTA** distributed diverted prescription drugs to CS 1 in exchange for cash.

15. On or about November 26, 2014, **RICARDO BOFFILL** took delivery of a cash payment from CS 1 in connection with diverted prescription drugs previously distributed to CS 1 by **ARMANDO ACOSTA** on or about September 24, 2014.

16. On or about January 21, 2015, **RICARDO BOFFILL** met with CS 1 and thereafter contacted **ARMANDO ACOSTA** on CS 1's behalf by telephone during this meeting and conveyed an order from CS 1 to **ARMANDO ACOSTA** for diverted prescription drugs which CS 1 had requested earlier during this same meeting.

17. On or about January 21, 2015, **ARMANDO ACOSTA** distributed diverted prescription drugs to CS 1 in exchange for cash.

18. On or about March 19, 2015, **RICARDO BOFFILL** met with CS 1, at which time, CS 1 supplied **RICARDO BOFFILL** with a list of types and quantities of diverted prescription drugs which CS 1 sought to obtain and, in response, **RICARDO BOFFILL** informed CS 1 that, on this occasion, CS 1 would be dealing with **JUANA ACOSTA**.

19. On or about March 19, 2015, **JUANA ACOSTA** and **RICARDO BOFFILL** met with CS 1, at which time, **JUANA ACOSTA** agreed to supply a certain quantity of diverted prescription drugs to CS 1.

20. On or about March 29, 2015, **JUANA ACOSTA** distributed diverted prescription drugs to CS 1 in exchange for cash.

21. On or about March 19, 2015, **RICARDO BOFFILL** met with CS 1, at which time, CS 1 supplied **RICARDO BOFFILL** with a list of types and quantities of diverted prescription drugs which CS 1 sought to obtain and, in response, **RICARDO BOFFILL** contacted **JUANA ACOSTA** and relayed the details of CS 1's diverted prescription drug order.

22. On or about September 10, 2015, **JUANA ACOSTA** and **RICARDO BOFILL** distributed diverted prescription drugs to CS 1 in exchange for cash.

23. On or about September 10, 2015, **JUANA ACOSTA** enlisted the assistance of another individual to conduct the process of removing prescription drug patient labels and residual adhesive remnants from containers of diverted prescription drugs then in the possession of **JUANA ACOSTA** in preparation for the eventual delivery of the diverted prescription drugs.

24. On or about September 16, 2015, **JUANA ACOSTA** distributed diverted prescription drugs to CS 1 in exchange for cash.

25. On or about September 30, 2015, **RICARDO BOFFILL**, along with CS 1, drove to a location from which **RICARDO BOFFILL** obtained a quantity of diverted prescription drugs from **JUANA ACOSTA**.

All in violation of Title 18, United States Code, Section 371.

_____
WIFREDO A. FERRER
UNITED STATES ATTORNEY


_____
PETER B. OUTERBRIDGE
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| UNITED STATES OF AMERICA | CASE NO. _____ |
|---|---|
| vs. | **CERTIFICATE OF TRIAL ATTORNEY*** |
| JUANA ACOSTA, ARMANDO ACOSTA and RICARDO BOFFILL, | |
| **Defendants.** _____ / | **Superseding Case Information:** |

**Court Division**: (Select One)

| | | | | | New Defendant(s) | Yes ___ | No ___ |
|---|---|---|---|---|---|---|---|
| X | Miami | ___ | Key West | | Number of New Defendants | ___ | |
| ___ | FTL | ___ | WPB | ___ FTP | Total number of counts | ___ | |

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No)     YES
   List language and/or dialect    SPANISH

4. This case will take  0  days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                    (Check only one)

   I:   0 to 5 days      X        Petty       ___
   II:  6 to 10 days     ___      Minor       ___
   III: 11 to 20 days    ___      Misdem.     ___
   IV:  21 to 60 days    ___      Felony       X
   V:   61 days and over ___

6. Has this case been previously filed in this District Court?   (Yes or No)    NO
   If yes:
   Judge: _____    Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?   (Yes or No)    NO
   If yes:
   Magistrate Case No. _____
   Related Miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the _____   District of _____

   Is this a potential death penalty case? (Yes or No)    NO

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?    ___ Yes   X  No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?    ___ Yes   X  No

                    PETER OUTERBRIDGE
                    ASSISTANT UNITED STATES ATTORNEY
                    Florida Bar No. 289914

*Penalty Sheet(s) attached                                                  REV 4/8/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** JUANA ACOSTA

**Case No:**

Count #: 1

Conspiracy to Defraud the United States and Engage in the Unlicensed Distribution of Prescription Drugs

Title 18, United States Code, Section 371

**\*Max. Penalty:** Five (5) Years' Imprisonment

\***Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:** <u>ARMANDO ACOSTA</u>

**Case No:** _____

Count #: 1

<u>Conspiracy to Defraud the United States and Engage in the Unlicensed Distribution of Prescription Drugs</u>

<u>Title 18, United States Code, Section 371</u>

**\*Max. Penalty:** <u>Five (5) Years' Imprisonment</u>

\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name: <u>RICARDO BOFFILL</u>**

**Case No:** _____

Count #: 1

<u>Conspiracy to Defraud the United States and Engage in the Unlicensed Distribution of Prescription Drugs</u>

<u>Title 18, United States Code, Section 371</u>

**\*Max. Penalty:**     <u>Five (5) Years' Imprisonment</u>

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| Juana Acosta, | ) | |
| | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| Armando Acosta, | ) | |
| | ) | |
| Defendant | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| Ricardo Boffill, | ) | |
| | ) | |
| Defendant | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*